UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| | | |
|---|---|---|
| CHRISTOPHER HARBIN, | ) | CASE NO. 1:16-cv-1905 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA PEARSON |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | THOMAS M. PARKER |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Christopher Harbin, seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for Supplemental Security Income

benefits under XVI of the Social Security Act ("Act").  This matter is before the court pursuant

to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

The Commissioner's decision was not supported with substantial evidence, and it does

not appear that correct legal procedures were followed.  I recommend the final decision of the

Commissioner be VACATED and REMANDED for further proceedings consistent with this

Report and Recommendation.

## II.      Procedural History

Plaintiff applied for a period of Supplemental Security Income on July 17, 2013.  (Tr.

196)  Plaintiff's application was denied initially on September 3, 2013 (Tr. 152) and after

reconsideration on October 31, 2014.  (Tr.158)  Mr. Harbin requested an administrative hearing

on November 21, 2013.  (Tr. 160)

Administrative Law Judge ("ALJ"), Tammy Georgian, heard the case on April 10, 2015. (Tr. 24)  The ALJ issued a decision on April 28, 2015, finding that plaintiff was not disabled. (Tr. 9-19)  Plaintiff requested a review of the hearing decision on June 26, 2015. (Tr. 7)  On May 27, 2016, the Appeals Council denied review, rendering the ALJ's April 28, 2015 decision final. (Tr. 1-6)

Plaintiff instituted this action to challenge the Commissioner's final decision. (Doc. 1)  The record evidence and all required briefing have been submitted, and the matter is ripe for decision.

## III.    Evidence

Mr. Harbin was born on September 7, 1974.  (Tr. 18)  He did not finish high school and has no significant past work experience.  (Tr. 33, 36-38)  He lives with his father and has very little interaction with anyone else. (Tr. 29, 62-65)

### A.    Medical Evidence

Plaintiff has had several head injuries.  In 1987, when he was twelve, he was seen at the emergency room for a laceration to his upper lip after another child was pushed into him. Plaintiff reported that he had struck his face on the other child's teeth. (Tr. 335)  In 1994, he went to the emergency room reporting that he and his father had been "jumped by some guys." He was struck from behind and fell forward striking the left side of his head.  He was diagnosed with nasal contusion and blunt head trauma. (Tr. 330)  In January 2004, plaintiff went to the emergency room after a car accident reporting that he had struck his head.  The doctor noted some swelling but did not feel that diagnostic testing was necessary.  Plaintiff was diagnosed with an acute scalp hematoma and acute lumbar strain. (Tr. 323)  In September 2004, plaintiff went to the emergency room after being assaulted and knocked to the ground.  He reported that

he had been punched in the back of his head and neck.  X-rays and a CT scan returned normal results.  Plaintiff was diagnosed with a head injury, trunk contusion and cervical/lumbar strain. (Tr. 304-306)

On January 15, 2014, Harbin first sought treatment from Signature Health.  He was initially seen by Donna Colucci, RN, LSW, LNHD, for a diagnostic assessment.  (Tr. 299) Plaintiff reported that he got angry easily; was depressed; had been unable to find or keep a job; had no motivation; no energy; and had been unable to see his children.[1] (Tr. 299)  Plaintiff reported occasional suicidal ideation but denied any plan. (Tr. 299) He said he felt helpless, hopeless, worthless, had no confidence in himself, had uncontrollable anger, difficulty focusing and concentrating, was always restless and had difficulty sitting still. (Tr. 299)  Ms. Colucci noted that plaintiff presented with a mood disorder, not otherwise specified; intermittent explosive disorder; rule out Attention Deficit Hyperactivity Disorder, not otherwise specified; and should be referred for diagnostic assessment. (Tr. 299)

Dr. Peter Kontos, a psychiatrist at Signature Health, evaluated Harbin on January 30, 2014. (Tr. 292-296)  Plaintiff reported that he did not work because he could not get along with people.  He reported vague suicidal ideation; that he felt worthless and ashamed; and that he became easily angered with others – so he avoided them.  (Tr. 292)  He reported feeling anxious, depressed and frustrated and that he could not get along with others. (Tr. 292)  He described conflicts with his last wife where he would get angry and break things that she liked. (Tr. 292) He also reported hitting the wall in anger. (Tr. 292)  Plaintiff stated that he was unable to work because he had ongoing anxiety, depression and feared other people's intent. (Tr. 292)  Plaintiff

---

[1] Plaintiff had five children with different women; he was not married at the time of his application for benefits.

reported working four or five jobs in the past but he quit all of them because he could not get along with others, got upset, and was afraid he might hurt someone. (Tr. 294)

On mental status exam, Dr. Kontos made these findings: (i) plaintiff was well oriented with a clear sensorium; (ii) he demonstrated mild hyperactivity with ADHD symptoms and irritability; (iii) he did not have any other movement disorders including tremors or tics; (iv) he had average eye contact with occasional scanning and average speech, rate, tone and volume; he had suspicious, paranoid trends, but denied any hallucinations or delusions; his memory functions were average; he had mild to moderate distractibility with cognitive rigidity of a mild degree; and, as a coping skill, he laughed inappropriately and made fun of things that were somewhat serious. (Tr. 294-295)

Dr. Kontos diagnosed mood disorder, not otherwise specified, with mixed irritability, excessive anger, underlying anxiety, and depression; generalized anxiety disorder; ADHD, mixed type with temporal lobe features; history of intermittent explosive disorder; learning disorder; GERD, several minor head concussions, alopecia, chronic and areata. He noted that plaintiff was "unable to work in any regular gainful employment due to his untreated ADHD; mood disorder or excessive anger; suspicious/paranoid trends; and mixed anxiety/depressive states, which he has had for years. He [had] no financial gain, [was] dependent on his father for support and direction. He has had multiple failed relationships and has other interpersonal stressors." Dr. Kontos assigned a GAF score of 47. (Tr. 295)

Plaintiff saw Dr. Kontos again on March 31, 2014. (Tr. 286-290) Dr. Kontos found at that time that plaintiff was alert, pleasant, anxious, made good eye contact, had a neat appearance and fair judgment. (Tr. 282-284) Plaintiff reported that his sleep was always interrupted, with an average of 5 hours of sleep per night. Plaintiff felt that his sleep had worsened after he stopped

taking Carbamazepine. He also reported that he continued to get upset and irritable over minor things. He reported vague suicidal ideation and feelings of worthlessness and shame. He was instructed to start taking Carbamazepine again, Strattera and Abilify. (Tr. 290)

In May 2014, plaintiff's case worker, Christina Thompson, noted that plaintiff was friendly, cooperative, pleasant and cheerful with normal thought content and normal speech. (Tr. 272-273)

Plaintiff saw Dr. Kontos on July 24, 2014. Plaintiff reported that he had run out of medication due to a missed appointment. He had recently been mean to his dad; told him he was an idiot and was over-angered. Plaintiff reported that he had been doing better on the medication. (Tr. 389) Dr. Kontos noted a recent regression with exacerbated symptoms of insomnia, irritability and mood instability and inattentiveness due to noncompliance with medication. (Tr. 390) Dr. Kontos ordered plaintiff to titrate Strattera and to continue Carbamazepine and Abilify. (Tr. 390)

Plaintiff returned to Dr. Kontos on September 11, 2014. (Tr. 384-386) Plaintiff reported an improvement in his mood with less anger reaction, less anxiety and slightly improved focus with medications. (Tr. 385) However he had run out of Strattera and Abilify because he had missed an appointment. (Tr. 384) Dr. Kontos restarted Strattera and continued Carbamazepine and Abilify; he also prescribed Crestor and vitamin E. (Tr. 385-86)

Dr. Kontos wrote a letter on plaintiff's behalf to the Lake County Department of Job and Family Services. (Tr. 379-380) Dr. Kontos opined that plaintiff had made partial improvement with treatment but was unable to work efficiently and perform regular job function due to his conditions. (Tr. 379)

In November 2014, Dr. Kontos noted that plaintiff had gained weight and that his blood pressure had increased. (Tr. 375)  Dr. Kontos documented the following statement from plaintiff, "I am better on the meds. I am 80 to 90% better.  I am not as mean. I would break things and I slammed the door and kicked the couch once and slammed the remote a few times, I am not losing my temper as before, when I would I do get mad everyday at least once when I get calls to be sold something…"  Plaintiff was instructed to titrate Strattera and increase Carbamazepine and Abilify. (Tr. 375-77)

On January 7, 2015, plaintiff saw Dr. Kontos who continued to document reported improvement by plaintiff.  Dr. Kontos assigned a GAF score of 52 at this appointment. (Tr. 373)  On January 13, 2015, the Signature Health case manager, Christine Thompson, saw plaintiff.  At this appointment, she noted that plaintiff had been upset over the holidays and had broken items in anger.  His medications were helping but he was still isolating from others so that he did not hurt them. (Tr. 366)

Plaintiff met with Dr. Kontos on February 9, 2015 reporting improved sleep but that he was continuing to have problems, mild low energy and hypohedonia, and continued inattentiveness and trouble concentrating. (Tr. 361)  Plaintiff reported that he was still punching his forehead (not too hard) once per week and the walls one to two times per week.  (Tr. 362)  Dr. Kontos ordered plaintiff to continue Strattera and Carbamazepine, Simvastatin and Prilosec and to increase Abilify and Prazosin. (Tr. 363)

Plaintiff had a psychiatric medicine follow up appointment with Dr. Kontos on March 9, 2015.  (Tr. 351)  Dr. Kontos extended the visit to complete legal forms and interview plaintiff regarding his anger, anxiety and mood profiles. Plaintiff reported that his uncle had died; he had been a pallbearer; and that he had a rough time with the experience. (Tr. 352)  Plaintiff had been

more depressed and upset than normal. (Tr. 352) Dr. Kontos noted that plaintiff was subjectively and objectively depressed. Plaintiff reported that he was too depressed to get mad but could still become irritable, then impulsive and explosive, though not as severely as before. (Tr. 355) Plaintiff's diagnosis was the same as noted at earlier appointments. (Tr. 355) Dr. Kontos' notes regarding plaintiff's inability to work also remained the same. (Tr. 355) Dr. Kontos opined that plaintiff was unable to work in any job and that plaintiff's father would make an excellent payee if plaintiff were awarded any benefits. (Tr. 355-356)

On April 23, 2015, Dr. Kontos sent a message to Christina Thompson noting that his earlier notes contained a typo/error and that they should have read that plaintiff stated that he was "20 to 30% better," as opposed to "80-90%." (Tr. 394)

### B. Opinion Evidence

#### 1. Psychological Consultative Examiner – Richard C. Halas, M.A., - August 2013

Psychologist Richard C. Halas conducted a consultative examination of plaintiff on August 20, 2013. (Tr. 265-270) Plaintiff reported that he was not currently being treated for his emotional problems. When he was a child, he was seen and treated by a psychiatrist for behavioral problems. (Tr. 266) His family told him he had attention deficit disorder and was bipolar. (Tr. 266)

Dr. Halas noted that plaintiff was generally well kempt with a goatee. His father brought him to the assessment and closely accompanied him. (Tr. 267) He was more dependent than independent. (Tr. 267) Plaintiff's speech pattern was found to be slow and he gave very short, specific and goal-oriented responses. The quality of his associations was quite simple and adequate in their overall organization. He was found to have significant poverty of speech. (Tr. 267) Plaintiff had a flat affect and a mood reflecting depression. He strongly denied any thoughts of hurting himself or others. His psychomotor activity reflected retardation and his energy level

was described as poor and below average. (Tr. 267)  Plaintiff felt guilty because he was a failure as a parent.  He felt worthless and inadequate with a poor self-image.  He did not, however, feel hopeless or helpless.  (Tr. 267)

Dr. Halas noted that plaintiff's overall quality of consciousness was good.  He was oriented in time, place and person.  He knew the month, day, year, place, etc.  His short term memory and immediate recall were good and he was able to do simple calculations and was slow, but accurate, in doing serial 7s.  His thinking was generally more concrete than abstract. (Tr. 267)

Dr. Halas estimated that plaintiff's intellectual level was in the average range.  (Tr. 269) He classified plaintiff's conditions as: depressive order, not otherwise specified; borderline personality disorder with antisocial features and dependent traits; and his psychosocial stressors included unemployment, financial concerns, job support issues, dependency on father.  Dr. Halas assigned a GAF score of 55. (Tr. 269)

Dr. Halas opined that plaintiff would have little to no difficulty in the areas of understanding, remembering, and carrying out instructions; maintaining attention, concentration, persistence and pace to perform simple tasks and/or multi-step tasks; and responding appropriately to work pressures in a work setting. (Tr. 269-270)  However, he felt that plaintiff would have significant problems in responding appropriately to supervision and to coworkers in a work setting. He opined that plaintiff had personality issues and symptoms of depression which would likely interfere with his ability to interact with others.  Plaintiff's background information indicated that he "does not get along with anyone." (Tr. 270)

### 2. State Agency Reviewing Physician – Irma Johnston, Psy.D.

On August 30, 2013, state agency reviewing physician, Irma Johnston, Psy.D., found that plaintiff had the severe impairments of affective disorder and personality disorder. (Tr. 132) She opined that he had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 131-132) Dr. Johnston found that plaintiff was limited due to his depression but that he could carry out instructions for simple to more complex tasks in settings where there was no demand for a fast pace; could relate to others infrequently and superficially; might have reduced stress intolerance due to depression and personality disorder; and could adapt to settings where changes were infrequent and clearly explained. (Tr. 134) Dr. Johnston's review was completed before Harbin began receiving psychiatric care from Dr. Peter Kontos.

### 3. State Agency Reviewing Physician – Mel Zwissler, Ph.D.

Dr. Mel Zwissler, Ph.D., reviewed plaintiff's records in October 2013 and affirmed the opinions of Dr. Johnston. Dr. Zwissler opined that plaintiff could maintain attention, concentration, persistence and pace for simple and moderately complex 3-4 step tasks in settings with no strict time or production demands. However, due to his depression, personality disorder and reported difficulty getting along with others, he was limited to a job with no demand for a fast pace and that does not require working with the general public or closely with supervisors or coworkers as part of a team to complete tasks. (Tr. 146) Dr. Zwissler's review was completed before Harbin began receiving psychiatric care from Dr. Peter Kontos.

### 4. Treating Psychiatrist– Dr. Peter G. Kontos, D.O. – March 2015

On March 9, 2015, Dr. Kontos completed an anger management questionnaire at plaintiff's request. (Tr. 338-339)  Dr. Kontos did not believe plaintiff was a threat to himself or others. (Tr. 338)  However, he marked yes to the majority of questions on the form including that plaintiff seemed to get angry all the time and flew off the handle easily; he was tense the majority of the time; he felt like people were out to get him at times; he felt out of control and acted before he thought; when his anger took over he kept to himself; he had a hard time forgiving people; his anger had erupted into extreme violence; and plaintiff had thought of or threatened to kill someone; had indicated some people are afraid of him; he felt depressed; and displayed anger at other drivers for minor irritation.  Dr. Kontos noted that plaintiff was not a drinker or a drug user. (Tr. 338-339)

Dr. Kontos also completed an Anxiety Questionnaire with Medical Listing on March 9, 2016.  On this form, Dr. Kontos indicated that plaintiff had generalized persistent anxiety accompanied by motor tension; autonomic hyperactivity, apprehensive expectation and vigilance or scanning; persistent irrational fear of a people which resulted in a compelling desire to avoid them; and recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom, occurring on the average of at least once a week. (Tr. 340)  Regarding functioning, Dr. Kontos marked that plaintiff's conditions resulted in marked restrictions of activities of daily living; marked difficulties in maintaining social functioning, deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from the situation or to experience exacerbation of signs and symptoms. Dr. Kontos also opined that Harbin's limitations resulted in a complete inability to function independently outside his home.  (Tr. 340-341)  In the

comment section, Dr. Kontos wrote that plaintiff had a "minimal to mild decrease in anxiety and inattention with treatment.  His anxiety/anger level render him inefficient to maintain any residual sustained gainful employment." (Tr. 341)

Dr. Kontos also completed a form entitled "Assessment of Ability to do Work-Related Activities (Mental)."  Dr. Kontos indicated that Harbin had an extreme degree of impairment in his ability to relate to other people; a marked degree of restriction of daily activities (attend meetings, socialize with friends, etc.); a moderate degree of deterioration in personal habits; a marked degree of impairment in his ability to maintain concentration and attention for extended periods of time; a marked degree of impairment in his ability to sustain a routine without special supervision; and a moderate degree of impairment in his ability to perform activities without a schedule, maintain regular attendance and be punctual. (Tr. 342)  Dr. Kontos opined that Harbin would have a moderate limitation in his ability to understand, carry out, and remember instructions; a marked limitation in his ability to respond appropriately to supervision and co-workers; extreme limitations in his ability to respond to customary work pressures and to changes in the work setting; marked limitations in his ability to use good judgment; mild limitations in his ability to perform simple tasks; and marked limitations in his ability to perform complex repetitive or varied tasks and to behave in an emotionally stable manner. (Tr. 342)  Dr. Kontos stated that plaintiff's limitations had existed since at least July 31, 2006 and that plaintiff had last worked in 1994.  He indicated that plaintiff's medication would have a severe effect on his ability to function. (Tr. 343)  Dr. Kontos believed that Harbin's condition would likely deteriorate if he was placed under stress, especially of a job; that he would be unable to manage his own benefits; and that he would be absent from work more than three times per month. (Tr. 343)  Dr. Kontos listed plaintiff's diagnosis as mood disturbances, intermittent explosive anger,

anxiety and adult ADHD. (Tr. 344) He also noted that plaintiff had experienced multiple head

injuries and assigned a GAF of 53. (Tr. 344)

### C. Testimonial Evidence

#### 1. Plaintiff's Testimony

Plaintiff offered the following summarized testimony at the April 10, 2015 ALJ hearing:

(Tr. 26)

- He lived in a trailer with his father. (Tr. 29) His father provided the only source of income for the household. (Tr. 30) Plaintiff had five children, but none of them lived with him. (Tr. 29)

- Plaintiff did not have a drivers' license. It was suspended when he was convicted of driving under the influence ten years ago. (Tr. 31) Due to the cost, plaintiff chose not to get a new drivers' license and relied on his father for transportation. (Tr. 32)

- Plaintiff did not complete high school. He believed he was in 10th grade when he stopped going. He was expelled several times. (Tr. 33-34) Plaintiff attempted to obtain his GED but felt that he could not finish it. (Tr. 334-335)

- After he dropped out of high school, plaintiff worked as a carnival ride worker for a couple of months. He quit because the kids were "driving him crazy." (Tr. 36-37) He also worked on call at a dock shoveling things out of boats. (Tr. 37) He quit that job after spacing out and fearing that he would be buried alive. (Tr. 38) He also worked briefly on an assembly line at a toy factory. He worked for one day for a friend doing a roof. However, he quit because he "spaced out" and feared that he would get hurt. (Tr. 38)

- Plaintiff testified that the things that prevented him from working were: he did not like to be around people and got angry very easily. He was afraid he would hurt someone. (Tr. 40-41)

- Plaintiff testified that he punched himself in the head, bit himself, punched holes in the wall, and had broken his x-box. (53-56) He had also hit his dad. (Tr. 56)

- Plaintiff took several daily medications: Prazosin for high blood pressure; vitamin E; Strattera for ADHD; Carbamazepine for anxiety; Simvastatin for cholesterol; Aripiprazole for mental and mood disorder; Omeprazole for stomach and esophagus problems; and Abilify. (Tr. 41-44) Dr. Kontos had been increasing the dosages for some of his medications. (Tr. 53)

- Plaintiff had been treating at Signature Health since November 2013.[2] (Tr. 48) Plaintiff denied any breaks in his medication. (Tr. 48-49) He also denied telling his therapist that he was 80-90% improved. He claimed that a medical record containing such a note was an error. (Tr. 49) Plaintiff claimed that he never stated he was better when taking his medications. He felt that he had improved a little on medication, but not 80-90% improved. (Tr. 50, 53)

- Plaintiff smoked a pack of cigarettes per day. He didn't drink alcohol or take any recreational drugs. (Tr. 51)

- Plaintiff usually woke up in the morning between 9:00 and 11:00 a.m. He made things like bacon and eggs for breakfast. He took his medication, then played video games on the computer or watched television. He particularly liked an NFL show that came on at 4:00 p.m. (Tr. 56-59) Plaintiff did not do any household chores, other than taking out the trash. (Tr. 60) Plaintiff's father took him shopping. (Tr. 61-62) Plaintiff claimed he had been banned from Walmart for stealing. (Tr. 63)

- Plaintiff stayed in his room where he had a TV. (Tr. 65) Plaintiff testified that, other than shopping, he did not spend any time with his father. He believed that his father didn't like him but felt sorry for him and did not want him to be homeless. (Tr. 63-64)

- Before plaintiff began taking his medications, his anger level was 10/10 every day. After taking medication, he estimated his anger level was between 7 or 8/10, somedays as low as 6/10. (Tr. 70) However, when questioned about his level of anger at the hearing, plaintiff testified that his anger level was a 2/10 that day. (Tr. 85)

- Plaintiff did not feel that he was strong enough to lift 50 pounds. (Tr. 75) He thought he would have trouble standing or sitting because of fidgeting. (Tr. 75)

## 2. Testimony of Christina Thompson

Plaintiff's mental health case worker at Signature Health, Christina Thompson, also testified during the hearing. (Tr. 79-85) She provided the following pertinent information:

- Ms. Thompson had been seeing plaintiff every two to three weeks since the summer of 2014.

- Mr. Harbin struggled with anger, anxiety and comprehension. (Tr. 79-80)

---

[2] The medical records reveal that the Signature Health treating relationship actually began in January 2014.

- She believed Harbin had only experienced "nominal improvement" since he began taking prescription medications. She said that while he had noticed "some improvement," he still was isolating himself because he is afraid to be around people.

- She stated that Dr. Kontos' notes stating that plaintiff was 80-90% better on medication was an error. She has never heard plaintiff state that he was improved (to that extent) on medication. (Tr. 80-85)

### 3. Vocational Expert's Testimony

Vocational Expert ("VE"), Ted Macy, also testified at the hearing. (Tr. 85-90) Plaintiff did not have any significant work history. (Tr. 87) When asked whether a hypothetical individual with an RFC determined by the ALJ would be able to perform certain jobs, the VE testified that such an individual could perform certain jobs that existed in significant numbers in Northeast Ohio and the nation. (Tr. 87-88)[3] The VE testified that most employers do not tolerate an individual being off task more than 10% of the time or missing three or more days per month. (Tr. 89-90)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4]....

---

[3] It is unnecessary to describe the VE's testimony in more detail because the VE's findings are not being challenged in this appeal.

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

V.     **The ALJ's Decision**

The ALJ issued a decision on April 28, 2015. A summary of her findings is as follows:

1. Mr. Harbin had not engaged in substantial gainful activity since June 21, 2013, the application date. (Tr. 14)

2. Mr. Harbin had the following severe impairments: depressive disorder and borderline personality disorder. (Tr. 14)

3. Mr. Harbin did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14)

4. Mr. Harbin had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could perform simple, routine tasks, but not at a production rate pace; only infrequent and superficial interactions with co-workers and supervisors; no interactions with the general public as part of work duties; only occasional changes in the work setting. (Tr. 15-17)

5. Mr. Harbin had no past relevant work. (Tr. 18)

6. He was born on September 7, 1974 and, on the date the application was filed, he was 38 years old which is defined as a younger individual age 18-49. (Tr. 18)

7. Mr. Harbin had a limited education and was able to communicate in English. (Tr. 18)

8. Transferability of job skills was not material because plaintiff did not have any past relevant work. (Tr. 18)

9. Considering Harbin's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 18)

Based on the foregoing, the ALJ determined that Mr. Harbin had not been under a disability since June 21, 2013, the date his application was filed. (Tr. 19)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

      The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

      The court must also determine whether the ALJ applied proper legal standards. If not,

reversal is required unless the error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d

272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even

if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B. Treating Physician Rule[5]

Plaintiff argues that the ALJ failed to properly apply the treating physician rule when evaluating the opinions of plaintiff's treating psychiatrist, Peter Kontos, D.O.[6] Specifically, plaintiff argues that, even if the ALJ properly determined that the opinions of Dr. Kontos were not entitled to controlling weight, she failed to assign a specific weight to his opinion; only considered one aspect of his opinions (marked limitations in some of the "B" criteria); and failed to state good reasons for assigning less than controlling weight to his opinions.

The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the]

---

[5] The undersigned notes that the regulations have been revised for claims filed after March 27, 2017. See 20 C.F.R. § 416.927. Plaintiff filed his claim before the revision took effect.
[6] ECF Doc. 15, Page ID# 479-482.

case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ( ("In addition to balancing the factors to determine what weight to give a treating source opinion [when controlling weight has been denied,] the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [T]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.

The ALJ discussed Dr. Kontos's opinion at Step Four, as follows:

> The record contains a medical source statement from Dr. Peter Kontos, the claimant's treating psychiatrist dated March 9, 2015. He opines that the claimant has marked restrictions in the "B" criteria discussed above. I find this statement is inconsistent with the other substantial evidence of record. Accordingly, this statement is not entitled to controlling weight.
>
> Specifically, in March and May of 2014, Dr. Kontos describes the claimant as oriented, alert, neat, pleasant, cheerful, and as having a normal memory and an average intelligence.
>
> However, in July 2014, Dr. Kontos makes reference to the claimant having difficulties with mood and sleep. The difficulties were caused by the claimant's non-compliance with medications.
>
> Dr. Kontos noted the claimant was aware of the consequences of non-compliance.
>
> On November 11, 2014, Dr. Kontos reported that the claimant had stated that he was 80-90% better with medications. Dr. Kontos repeated this statement of 80-

90% improvement in the claimant's treatment notes on March 9, 2015. This was the same date when he completed the aforementioned treating source statement.

The claimant denied stating he made the comment that he was 80-90% better with meds. His case manager testified that the claimant told her he never made this statement. However, it is in the treatment notes twice and Dr. Kontos has made no effort to remove it.

As late as January 2015, Dr. Kontos again described the claimant as coherent, logical, goal oriented, and as having an average intelligence.

(Tr. 16)

The undersigned agrees with plaintiff that the ALJ's evaluation of the opinions of Dr. Kontos did not adhere to the regulatory procedures. Dr. Kontos completed three questionnaires regarding plaintiff's limitations. In them, Dr. Kontos opined on many different functional limitations that would impact plaintiff's ability to work. However, the ALJ only referred to one section of one of the questionnaires when she stated that Dr. Kontos "opines that the claimant has marked restrictions in the "B" criteria discussed above." The ALJ then stated that she found "*this statement* [was] inconsistent with the other substantial evidence of record." (emphasis added) Although the ALJ may not have intended to limit her discussion of the opinions of Dr. Kontos to only one of his statements, the explanation she provided certainly made it look like she only considered his opinion related to the B criteria and found that it was inconsistent with the record evidence. The Commissioner argues that the ALJ is not required to discuss every piece of evidence considered. Because the undersigned concludes there is ambiguity in the ALJ's decision regarding what she considered, this argument cannot prevail.

The ALJ's decision did not explain the weight she assigned to the opinion of Dr. Kontos.[7] "If the ALJ does not give the opinion controlling weight, then the opinion is still

---

[7] The Commissioner implicitly the ALJ's failure to explicitly state how much weight she assigned to Dr. Kontos' opinions, arguing that the failure was harmless. (ECF Doc. No. 17 Page ID #516)

entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist." 20 C.F.R. § 416.927(c)(2)(6). As noted above, the ALJ was not required to explain how she considered each factor but *was* required to state her "good reasons" specifically to make clear to any subsequent reviewers the weight she gave to the treating source's medical opinion and the reasons for that weight." 20 C.F.R. § 416.927(c)(2); see also *Cole,* 661 F.3d at 938. The only reason provided by the ALJ for rejecting the opinion of Dr. Kontos was that it was inconsistent with the other substantial evidence of record. As support, the ALJ pointed to portions of Dr. Kontos' records where he described the plaintiff as oriented, neat, pleasant, cheerful and as having a normal memory. However, Dr. Kontos merely used those adjectives to describe plaintiff during his appointments. They were not necessarily a good description of how plaintiff would relate in a workplace setting. Despite those descriptors, Dr. Kontos expressed grave reservations about plaintiff's ability to work. Thus the ALJ's seizure upon these terms as a basis for finding "inconsistency" amounted to the substitution of her psychiatric viewpoints for those expressed by the treating physician.

In further discrediting the opinion of Dr. Kontos, the ALJ emphasized several of his notes stating that plaintiff said he was 80-90% better on medication. The ALJ also stated that Dr. Kontos repeated this note in subsequent medical records. However, this fact is not particularly significant because it appears that much of the plaintiff's history and notes made from earlier visits were repeated in records documenting subsequent visits. Both plaintiff and his case worker testified that this note was incorrect. And the case worker said she'd never heard Harbin make such a statement; she characterized his medicated improvement as "nominal."

The administrative record contains a typed message from Dr. Kontos to the case worker stating that plaintiff indicated he was 20-30% better on medication and that the note should be corrected. (Tr. 394) As the Commissioner points out, however, this record was created on April 23, 2015 two weeks after the ALJ hearing (but five days prior to the April 28, 2015 ALJ decision was issued). And it appears that the record was not submitted to SSA until it plaintiff's counsel faxed it on June 26, 2016, the same date on which plaintiff sought Appeals Council review. There is no evidence that the ALJ was aware of Dr. Kontos' effort to correct his notes at the time the matter was decided, and this court may not consider it now. Nevertheless, in light of the direct testimony that the note contained an error and direct testimony from Caseworker Christina Thompson that she never heard Harbin say he was 80-90% improved when medicated, it is troubling that the ALJ latched onto that issue as the apparent sole basis for concluding that Dr. Kontos' questionnaire opinions were inconsistent with his medical records. Apart from a bare statement of such purported inconsistency, the ALJ said almost nothing. She did not discuss any of the other factors that must be considered when determining how much weight to be assigned to the treating source. Simply put, the ALJ's decision did not make it sufficiently clear to subsequent reviewers, including this court, the weight she assigned to Dr. Kontos' opinion or the reasons for assigning less than controlling weight.

There may, in fact, have been good reasons to reject the opinion of Dr. Kontos in this case. For example, the questionnaires completed by Dr. Kontos were largely "check-box" opinions. See *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016); *Price v. Comm'r* of Soc. Sec., 342 F. App'x 172, 176 (6th Cir. 2009). But the ALJ did not note this in her decision and generally failed to provide any statement of her "good reasons" for rejecting the treating psychiatrist's opinion.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error." This occurs when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 547 (6th Cir. 2004). See also *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. See *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.,* 375 Fed. Appx. 543, 551 (6th Cir. 2010). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. Appx. at 551.

Here, the ALJ decision did not assign controlling weight to the opinion of plaintiff's treating psychiatrist, failed to explain the weight that was assigned, and did not sufficiently state good reasons for doing so. The wording of the ALJ's decision makes it appear that she only considered one aspect of the treating source's opinion, the paragraph B criteria. She rejected the treating source's opinion, in part, because it contradicted a statement allegedly made by plaintiff and recorded in the psychiatrist's records - a statement which was highly disputed by plaintiff and his case worker. The undersigned notes that the ALJ also rejected portions of the consulting

psychiatrist's opinion but assigned great weight and adopted the limitations opined by the non-examining psychologist who merely reviewed plaintiff's file (examinations which did not include a review of the opinions of Dr. Kontos). (Tr. 17)  The court cannot say that the ALJ's errors in the handling of the medical opinions in this case were harmless.  Although there may have been good reasons to reject the opinion of Dr. Kontos, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review.

### C.    Whether the ALJ's Determination at Step Three was Supported by Substantial Evidence

Plaintiff also argues that the ALJ erred at Step Three of her analysis.  In one of the statements provided by Dr. Kontos he opined that plaintiff met the criteria for Listing 12.06.  (Tr. 340-341)  Plaintiff contends that, by failing to properly evaluate the opinion of plaintiff's treating psychiatrist, Dr. Kontos, the ALJ made it impossible for meaningful review of Listing 12.06. Plaintiff argues that the ALJ did not cite relevant medical opinion evidence in her Step Three analysis and that the decision should be remanded on that basis.

Listing 12.06, *Anxiety and obsessive-compulsive disorders,* is satisfied if the requirements of A and B, or A and C are met:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

       a. Motor tension; or
       b. Autonomic hyperactivity; or
       c. Apprehensive expectation; or
       d. Vigilance and scanning;

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

B. AND resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.06

At step three, the claimant has the burden to show that his impairments meet or equal a listed impairment. *Buress v. Secy' of Health & Human Servs.,* 835 F.2d 139, 140 (6th Cir. 1987). "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has equivalency. *Thacker v. Soc. Sec. Admin.,* 93 F.App'x 725, 728 (6th Cir.). Here, plaintiff presented an opinion from his treating psychiatrist indicating that plaintiff met the requirements of Listing 12.06. The ALJ was not required to give this opinion controlling weight. However, as noted above, she was required to provide good reasons for failing to do so. Other than disagreeing with Dr. Kontos'

statement regarding the paragraph B criteria, the ALJ did not discuss his opinion.  Nor did the

ALJ's decision ever explicitly discuss whether plaintiff met or medically equaled Listing 12.06.

Arguably, the ALJ did consider whether plaintiff met Listing 12.06 when she rejected Dr.

Kontos' evaluation of the Paragraph B criteria and concluded that the Paragraph C criteria also

could not be met because "[t]he claimant is not homebound."  Perhaps this was the ALJ's

shorthand for finding that there was insufficient evidence from which to conclude that plaintiff

had a "complete inability to function independently outside the area of one's home."  With

virtually zero discussion of the specific facts as applied to the legal criteria, the undersigned must

use conjecture to assess whether the ALJ has conducted an appropriate legal analysis.  That alone

suggests a lack of substantial evidence for that portion of the ALJ's decision.  The ALJ's

decision should be vacated so that the ALJ can properly evaluate the opinion of Dr. Kontos and

whether plaintiff met the requirements of Listing 12.06.

### D.      Credibility Assessment

Plaintiff also argues that the ALJ failed to explain her decision regarding plaintiff's

credibility.  It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses,

including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997);

*Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs*.,

667 F.2d 524, 538 (6th Cir. 1981).  However, the ALJ is not free to make credibility

determinations based solely upon an "intangible or intuitive notion about an individual's

credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.  Rather, such determinations must

find support in the record.  Whenever a claimant's complaints regarding symptoms, or their

intensity and persistence, are not supported by objective medical evidence, the ALJ must make a

determination of the credibility of the claimant in connection with his or her complaints "based

on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The consistency of the various items of information contained in the record must be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain the credibility determinations in her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.*

In her decision, the ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 16) The ALJ then proceeded to describe instances in the medical record suggesting that plaintiff was cooperative, pleasant, went shopping, cooked, cleaned, etc. (things that have little to do with whether he is anxiety-limited when around other people, including co-workers). These references could be interpreted as conflicting with statements made by the claimant. But the ALJ never identified any of plaintiff's contradictory statements or specifically explained how they conflict with the medical records. Also, as discussed above, the ALJ attached significance to the allegedly incorrect statement that plaintiff

was 80-90% improved with medication. The ALJ's decision on the issue of plaintiff's credibility is a close call. Although the ALJ could have done a better job explaining her decision on plaintiff's credibility, the undersigned would not recommend remand on that basis alone. However, because the undersigned is recommending that the case be remanded for further proceedings on other grounds, it is also recommended that the ALJ provide a better explanation of the determination of plaintiff's credibility.

## VII.    Recommendation

The court should find the decision of the Commissioner was not supported by substantial evidence. The ALJ's decision on how to weigh the treating source evidence was not adequately supported, and the explanation of how or whether Listing 12.06 was considered was insufficient. I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.


Dated: May 25, 2017

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**